IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| NELSON MENDES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 5:19-cv-00072 |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| MATTHEW WENDLING, et al., ) | United States District Judge |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Nelson Mendes owned property in Warren County (the Property) that was subject to zoning enforcement by Warren County employees. In the claims that remain before the court, he alleges that in enforcing the zoning ordinance defendants Matthew Wendling, Joseph Petty, and Taryn Logan (all employed by Warren County in the Planning Department) treated him differently than other property owners with similar violations (class of one), violating his rights under the Equal Protection Clause of the Fourteenth Amendment. Mendes also claims that Wendling's unauthorized entry to his property infringed upon his Fourth Amendment rights. Defendants move for summary judgment on both claims. (Dkt. No. 42.) For the reasons stated below, the motion for summary judgment will be granted.

I. BACKGROUND

**A. Generally**

On May 2, 2017, Mendes purchased the Property, a 6.667-acre parcel in Warren County. The Property is in the flood plain, is part of the Warren County Special Flood Hazard Area (SFHA), and sits on the bank of the Shenandoah River. The Property is located in the Agriculture (A) zoning district. On the Property, there are several structures: a deck, a ramp with

stairs, a hoop house/greenhouse, and two garages. None of these structures is a residence. (Mendes Dep. 59, Dkt. No. 45-1.) Pursuant to County Code section 180-16F(1)(a), "All uses, activities and development occurring within any floodplain district shall be undertaken only upon the issuance of a zoning permit" and compliance with the Building Code is also required. Also, pursuant to County Code section 180-32D(2), in the Agriculture District only one accessory building not larger than 600 square feet is allowed on the property without a primary structure if the lot is greater than 2 acres but less than 10 acres in size.

Wendling, Petty, and Logan worked in the Planning Department during the enforcement action against the Property. Wendling was the Deputy Planning Director & Floodplain Manager. Petty worked as the Deputy Zoning Administrator until August 2019 when he became the Zoning Administrator. Logan served as Planning Director.

## B. Federal Emergency Management Agency (FEMA) and the Community Assistant Visit (CAV)

In 2016, Warren County passed a resolution to allow it to participate in the Federal Emergency Management Agency's (FEMA) community rating system. This system allows residents who pay flood insurance to obtain discounts if the County qualifies for certain flood plain management practices. To participate, a Community Assistance Visit (CAV) is required. In December 2018, the County was advised that the CAV would occur in March 2019. Shortly thereafter, in preparation for the three-day CAV, Wendling began working on a list of communities and sites to visit. He was looking for properties in the SFHA where there were permanent structures. Wendling had been the Flood Plain Manager for eleven years, so he knew the sites in the floodplain and was also looking at public areas, such as boat landings.

### C. The Property Comes to the Attention of Wendling and Petty on January 11, 2019

On January 11, 2019, and in preparation for the CAV, Wendling was scrolling through the County's aerial geographic imaging system (GIS) looking for a boat landing, belonging to someone named Simpson, that happened to be near the Property. (Wendling Dep. 27, Dkt. No. 45-4.) While doing so, Wendling observed the Property because "it just stuck out like a sore thumb." (*See* GIS images of the Property, Dkt. No. 43-24.) He could see that the Property had been cleared and that there were structures in the floodplain. (*See id*.) "It was a complete different look than the adjacent parcels, in the way of the adjacent parcels are a combination of forestry and there are some single-family dwellings down the road." When Wendling saw the Property, Petty was in the office and Wendling called Petty over to show him the structures on the Property. (Wendling Dep. 53.) Petty noted that there was a large area of the Property, five to six acres, that had been clearcut. (Petty Dep. 19, Dkt. No. 45-3.) In toggling between an earlier year and the current GIS, "there was quite a difference in the two" according to Petty. (*Id*.) In reviewing the Property site on the GIS, Petty observed three structures, a deck, and a ramp. (*Id*. at 48-49.)

After viewing the GIS image, Petty researched whether the structures on the Property had permits, and he accurately found that none of them had building permits. (Petty Dep. 22.) He also found that the Property had open issues with the Warren County Building Inspection department related to "land disturbing activity" and electrical permits. (*Id.* at 24.)

That same day, a Friday, in the afternoon, Wendling was going out in the field to see some County-owned property in the SFHA. He then proceeded to Simpson's boat landing and, without prompting from anyone, then to the Property. Wendling accessed the Property without the permission or knowledge of Mendes. Mendes had posted "No Trespassing" signs on the

3

Property which Wendling bypassed. (Mendes Dep. 118). Wendling proceeded 500 feet onto the Property while remaining approximately 100 feet from all the structures. (Wendling Dep. 46-47). He saw a shed at the top of the hill and two structures. He got out of the car and saw the hoop house and the two sheds and the railing of the deck. It appeared to be a combination of recreational and agricultural land use with no observed erosion issues from the disturbed area of the land. Wendling did not mention this site visit, or his observations from the site visit, to Petty until after Mendes filed this lawsuit. (Wendling Decl. ¶ 7, Dkt. No. 43-27.)

Prior to January 11, 2019, Petty and Logan had no knowledge of Mendes or the Property. (Petty Dep. 15, 20; Logan Dep. 36-39, Dkt. No. 45-2.) Wendling had no knowledge of Mendes until January 11, 2019, but he had learned of the Property in 2015 (under different ownership) when dealing with an electrical permit issue. (Wendling Dep. 24-25.)

**D.  Petty Issues a Notice of Violation on January 16, 2019**

After having observed the GIS imaging of the Property and without knowledge of Wendling's site visit, Petty alone determined, as Deputy Zoning Administrator, that the Property was in violation of County Code sections 180-16(F)(1) and 180-31(D)(2). (Petty Dep. 99-100; Wendling Dep. 51.) Pursuant to County Code section 180-60D, the Zoning Administrator is directed to "investigate any alleged violation, and, if it is determined that a violation does exist, the Zoning Administrator shall notify the person permitting or committing the violation to cease and/or correct such violation."

Petty issued a notice of violation (NOV) for the Property to Mendes on January 16, 2019, which notice provided for an appeal before the Board of Zoning Appeals within thirty days. (Notice of Violation, Dkt. No. 43-1.) Wendling saw the letter, but he provided no comment. (Wendling Dep. 56.) It was Petty's general practice to issue NOVs as the first communication to

a property owner for zoning violations. Indeed, between January 1, 2018, and June 30, 2019, Petty issued 109 NOVs, with only 25 of those preceded by a Notice of Inspection. (Petty Decl. ¶ 7, Dkt. No. 43-26.)

Mendes' first interaction with any of the defendants was his receipt of the NOV. On February 8, 2019, Mendes and Petty met at the Property, making this the first time Petty had been to the property. (Petty Dep. 36). After this meeting, Mendes and Petty were unable to reach an agreement about what permits were required for the structures. Nevertheless, they did agree to let FEMA visit the Property during the CAV to give its opinion on the structures. (Dkt. No. 48-27.)

### E. CAV Visit to the Property and Other Properties

The CAV took place from March 26 through 28, 2019. Many properties were visited, including the Property. Over 100 properties were identified during the CAV has having potential issues and/or violations. Mendes identifies 12 properties that were part of the CAV as comparator properties. These properties had accessory structures in the floodplain, but those property owners had not been sent NOVs. Unlike the Property, the suggested comparator properties are all in the R-1 zoning district, which permits accessory structures by right if there is a house on the property, and the defendants were not aware of any potential violations on those properties prior to the CAV. (Petty Decl. ¶ 9; Wendling Decl. ¶ 8; Wendling Dep. 62.)

After the CAV, Mendes and other property owners who were or might be in violation status received letters regarding the FEMA Site Visit from Wendling. (Dkt. Nos. 43-2, 9-21.) Mendes' letter was similar to the letters sent to other property owners who were part of the CAV. (Wendling Dep. 99.) Following issuance of the letters, appropriate follow-up action was taken to resolve the violations and/or potential violations. (Pl.'s Exs. 11-22, Dkt. No. 43; Petty Decl. ¶¶

8–11; Wendling Decl. ¶¶ 8–12.) Regarding the Property, this included Petty informing Mendes that the Property's structures still required building permits. Petty supplied Mendes with an agricultural exemption application, which Mendes completed. Even with this completed exemption form, Petty still believed that the structures required permits. Because of their continued dispute, on May 1, 2019, Petty issued a Zoning Determination to allow Mendes to appeal his decision to the Board of Zoning Appeals. Mendes then appealed the Zoning Determination to the BZA. The BZA overturned the majority of the Zoning Determination, finding that all structures except the deck and ramp were agriculturally exempt, based on the exemption Mendes had filed. (Dkt. No. 43-23.) For the deck, the BZA required Mendes to submit a zoning permit application and pay a $10 application fee. (*Id*.) This settled the zoning issue for the Property, though there still may have been building permit issues. (Petty Dep. 117-118).

**F. Involvement of Defendant Logan**

The briefing is almost silent as to any personal involvement of Planning Director Logan. At the hearing, plaintiff mentioned that she was involved in conversations regarding the Property and that she, along with the BZA visited the Property during a summer site visit. Plaintiff agreed she was not substantially involved and was involved only as a supervisor, but he admits that there is no claim for supervisory liability alleged against her.

II. ANALYSIS

**A. Motion for Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could determine the outcome of the

case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). And it is the burden of the moving party to show the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After this showing has been made, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. Rule Civ. Proc. 56(e)). If the nonmoving party is unable to provide facts that show a genuine issue for trial, then the granting of summary judgment is proper. Fed. R. Civ. P. 56(e)(3).

When considering a motion for summary judgment, the court does not "weigh the evidence"; instead, the court determines whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248-250. For this determination, the evidence, inferences, and arguments of the case are considered in the most positive light for the nonmoving party. *Martin v. Duffy*, 977 F.3d 294, 298 (4th Cir. 2020).

### B. Lack of Personal Involvement of Defendant Logan

Liability under section 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, a § 1983 claim requires factual detail about each defendant's personal involvement. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights and affirming dismissal of claim where plaintiff did not allege personal involvement by defendant) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). Mendes has failed to demonstrate Logan's personal involvement and admits that he is

not pursuing supervisory liability. Thus, the motion for summary judgment as to Logan will be granted.

### C. Equal Protection Class of One

A class of one determination can be made when the plaintiff has been "intentionally treated differently from others similarly situated and … there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); s*ee also Nes v. Anne Arundel County*, 95 F. App'x. 497, 500 (4th Cir. 2004) (dividing class of one claims into three distinct parts: treated differently than others similarly situated, intentional, and not rational). "For a plaintiff to demonstrate that she is 'similarly situated,' her evidence 'must show an extremely high degree of similarity between [herself] and the persons to whom [she] compare[s]' herself." *Willis v. Town of Marshall*, 275 F. App'x. 227, 233 (4th Cir. 2008) (citing *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)); *see also Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 640 (1st Cir. 2013) ("But a class-of-one plaintiff bears the burden of showing that his comparators are similarly situated in all respects relevant to the challenged government action."). As such, a class of one claim must present comparable examples of others receiving different treatment in similar situations. *See Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 440 (4th Cir. 2002). While the issue of similarity is generally a question of fact for the jury, *Willis v. Town of Marshall*, 275 F. App'x at 233 (citing *Clubside, Inc.*, 468 F.3d at 159; *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)), plaintiff must present more than unsupported assertions in opposition to summary judgment.

Class of one claims are subject to rational basis review. *See Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 559 (4th Cir. 2013). To survive rational basis review, the government must show that its actions were "rationally related to a

legitimate government interest." *Thomasson v. Perry*, 80 F.3d 915, 946 (4th Cir. 1996). This is an objective test. *See Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012). Regardless of the government's actual motivation, there must be a plausible and reasonable justification for the government's act to satisfy rational basis. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). When there is not a rational basis for the government's actions, the court determines whether the defendants acted intentionally by comparing their actions to how they treated those similarly situated. *See generally King v. Rubenstein*, 825 F.3d 206, 221 (4th Cir. 2016) (finding intentionality by comparing the plaintiff to two similarly situated inmates with no rational reason to treat them differently).

The dispositive factor for this class of one analysis is that the defendants' actions satisfy the rational basis test. Mendes presents twelve comparator properties which he claims are similar to the Property. Defendants maintain that they were unaware of the comparator property violations; this fact would provide a rational basis for any disparate treatment between the Property and the comparators. (Petty Decl. ¶ 9; Wendling Decl. ¶ 10; Wendling Dep. 62.) Mendes attempts to craft a dispute of fact by arguing that Wendling reviewed the GIS data before the CAV and became aware of some of the comparator property violations. A review of Wendling's deposition testimony, however, does not support any dispute. Wendling clearly testified that when using the GIS to look for CAV communities and sites, he was not looking at specific properties other than boat landings and that type of thing. (Wendling Dep. 61-62.) In doing so, he did not notice any other properties that could have been subject to a NOV at that time. (*Id.*) Later, when discussing accessory structures seen during the CAV and referenced in letters sent following the CAV, Wendling was asked if those accessory structures were visible on the GIS. (Wendling Dep. 101-103). He answered that some of them were. (*Id.* at 102-103.)

However, Wendling was not asked and did not testify that he observed them on the GIS before the CAV. Instead, he testified that he did not use GIS for that purpose; rather, he used GIS to confirm something seen out in the field – "unless it was something just completely blatant." (*Id*. at 104-105.) Mendes has not put forward any evidence to demonstrate that Wendling, Petty, or Logan had any knowledge of the comparator property violations when Petty issued the Notice of Violation to Mendes.

Because the defendants' actions have a rational basis, Mendes' class of one claim cannot succeed regardless of whether the proposed properties are adequate comparators or whether the comparator properties were treated more favorably. Nevertheless, for clarity, the arguments of the parties will be summarized. For the comparator properties to be a relevant comparison, they must be extremely similar to the Property. *See Willis*, 275 F. App'x. at 233. Mendes asserts that the comparator properties are in the same flood hazard area as the Property, contain violations visible on the GIS or from public roads, and violate the same section of the Warren County Zoning Code, 180-16.F. The defendants argue that the comparator properties differ from Mendes' property too much to meet the threshold of substantial similarity. They point to the presence of dwellings on the comparator properties and the fact that the comparator properties were in a different zoning district with distinct rules. In particular, the comparator properties' zoning district allows additional structures to be built without permits if there is a dwelling on the land. (Wendling Dep. 177-178.) The Property's zoning district does not have this privilege. (Petty Dep. 32-33.)

Even if the court assumes that the comparator properties are valid comparators and that Wendling could have seen violations on the comparator properties had he looked, and even if the court were to assume that Wendling knew about some of the comparator property violations,

Wendling only treated the Property differently in one way.  Wendling called the Property to Petty's attention when viewing the Property on the GIS.  The undisputed reason for doing so is that the newly cleared land on the Property made its violations blatantly clear to Wendling. (Wendling Dep. 176-177), and Petty noted the same when he looked at the Property on the GIS (Petty Dep. 19.)  Mendes has not come forward with any evidence that the comparator properties had blatant violations similar to the Property.  As such, the more obvious nature of the Property's violations is an objectively rational reason for Wendling only informing Petty of the Property and not the others.  Wendling's decision to enter the Property, though unique to the Property, did not play any role in the enforcement against the Property.  (Petty Dep. 99-100; Wendling Dep. 51.)  Otherwise, Wendling's only other noteworthy act related to the Property was to send a letter notifying the owners of the Property and all the properties subject to the CAV of any findings or concerns following inspection.  These letters were substantially the same between the comparators and the Property.  (Wendling Dep. 99.)

      Mendes claims that the comparator properties received more lenient enforcement than the Property.  Specifically, he asserts that the defendants' actions were faster and more aggressive with the enforcement against the Property.  (Pl.'s Mem. Opp'n. Summ. J. at 13, Dkt. No. 48.) Defendants argue that Petty's enforcement actions were consistent with how he treated the majority of properties with violations.  (Petty Decl. ¶¶ 4-6.)  Also, after the CAV, Wendling was the one to follow up with the comparator properties, as a follow-up by staff was the typical practice when a violation was confirmed in the field.  (Wendling Dep. 151.)  Mendes argues that the comparator properties were treated more gently and were given more time to resolve their issues.  However, Petty put enforcement "on hold" for the Property to allow FEMA to provide input during the CAV.  (Dkt. No. 48-27.)  The primary difference then between the comparator

11

properties and the Property is that the comparator properties received a visit before receiving any notice from staff. However, in the case of the Property, the violation was readily apparent without a visit, so there was no need to wait until after the CAV to begin the correspondence. (*See* Dkt. No. 43-24.)

Mendes claims that Petty repeatedly changed his assessments of what kinds of permits would be required for the Property. Mendes has not asserted specific facts that support this claim. Instead, Mendes has provided documents that show a consistent effort from Petty to ensure the Property's structures follow the Zoning Ordinance. (Dkt. No. 48-24, 26, 27, 30.) Even if Petty's assessment of the Property did change after issuing the NOV, it is rational that a zoning official may change his or her assessment as the official gathers more information. These documents likewise match Petty's claim that he acted in the way that he thought would best enforce the Zoning Ordinance. (Petty Dep. 134-135). Mendes disputes Petty's goal but provides no evidence to show he acted with different motivations. Regardless of Petty's motivation, rational basis only requires an objectively rational motive for the government action, and, here, upholding the Zoning Ordinance satisfies that.

The defendants had a rational basis to treat the Property differently than the comparator properties. The treatment of all the properties fulfills a legitimate government objective to have zoning regulations enforced when government actors are aware of violations on properties. Regardless of whether the defendants' acts were intentional or whether the comparators were similarly situated, Mendes' class of one claim cannot succeed. Because of this, there is no genuine dispute of material fact between the parties. The defendants' motion for summary judgment on the class of one claim is granted.

**D. Fourth Amendment**

Mendes' remaining claim is that Wendling violated the Fourth Amendment when he inspected the Property on January 11, 2019. As the Supreme Court wrote in *Brigham City v. Stuart*, "The ultimate touchstone of the Fourth Amendment is reasonableness." 547 U.S. 398, 403 (2006). To ascertain if a claim is reasonable, the court must determine "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). A legitimate expectation of privacy exists when the individual has a (1) subjective expectation of privacy in the area searched, and (2) society is willing to recognize that expectation as legitimate. *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013).

The government's entry into an area protected by the Fourth Amendment without permission for the purpose of obtaining information is an unlawful search. *United States v. Jones*, 565 U.S. 400, 406 n.3. (2012). To determine if an area outside the home is protected by the Fourth Amendment, it must be determined whether that area is within the curtilage of the home or conversely is considered part of the open fields. *Hester v. United States*, 265 U.S. 57, 59 (1924); *United States v. Breza*, 308 F.3d 430, 435 (4th Cir. 2002). While the curtilage of the home has a reasonable expectation of privacy and is protected, an area like a field is not protected according to the "open fields doctrine." *Oliver v. United States*, 466 U.S. 170, 180 (1984); *see also Rogers v. Pendleton*, 249 F.3d 279, 287 (4th Cir. 2001) (finding that the curtilage of the home receives the same Fourth Amendment protections as the home itself); *Shafer v. United States*, 229 F.2d 124, 128-129 (4th Cir. 1956) (holding fields used for agriculture can be open fields).

To make this distinction between open fields and curtilage, the court uses the four factors identified by the Supreme Court in *United States v. Dunn*, 480 U.S. 294, 307 (1987).  These factors are (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.  *Dunn*, 480 U.S. at 307; *see, e.g.*, *United States v. Hooper*, No. 21-4220, 2022 WL 1184181, at *2 (4th Cir. Apr. 21, 2022); *United States v. Smith*, 456 F. App'x. 200, 207-208 (4th Cir. 2011).  The court weighs these factors to decide whether the place is "so intimately tied to the home" that it ought to be part of "umbrella" of the home's protection.  *Dunn*, 480 U.S. at 301; *United States v. Jackson*, 728 F.3d 367, 374 (4th Cir. 2013).

Fourth Amendment protection from unlawful search and seizure is separate from state laws preventing trespass.  *Jones*, 565 U.S. at 406 n.3.; *See Oliver*, 466 U.S. at 183.  This is because Fourth Amendment protection does not depend on any specific property rights.  *Rakas*, 439 U.S. at 143.  Additionally, the government official's beliefs as to the legality of an act have no relevance when determining whether a government act violated the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 814 (1996).  Instead, the court must objectively examine the reasonableness of the government official's conduct.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011).  The Supreme Court has made it clear that the Fourth Amendment protects people from certain government conduct, not the thoughts of the actor.  *Id*.

There is no genuine dispute of material fact regarding the Fourth Amendment claim, and Mendes makes no response in briefing to contradict application of the open fields doctrine.  None of the structures on the Property are a residence or dwelling.  (Mendes Dep. 59.)  Without a home on the Property, there is no "umbrella" of Fourth Amendment protection to extend.

*Dunn*, 480 U.S. at 301.  Applying the *Dunn* factors, (1) there is no proximity between the part of the Property Wendling entered and the home, because there is no home on the Property. Additionally, (2) the property was not enclosed at the time,[1] (*see* Wendling Dep. 45), and (3) the nature of the Property is agricultural, a use repeatedly found to coincide with open fields.  *See United States v. Campbell*, 395 F.2d 848, 848 (4th Cir. 1968); *Shafer v. United States,* 229 F.2d 124, 128-129 (4th Cir. 1956); *Janney v. United States*, 206 F.2d 601, 602 (4th Cir. 1953).  While Mendes did post "No Trespassing" signs and had a gate, *Dunn* factor 4, to prevent passersby from observing the area, there was no home or dwelling to be observed.  Taken together, these factors show that Mendes' property ought not to have the umbrella of the home's protection, because the Property does not contain a home.  Therefore, the court considers the entirety of the Property an open field.  Under the "open fields doctrine," Mendes has no reasonable expectation of privacy in the Property.[2]

### III. CONCLUSION

For the reasons stated herein, the court will issue an appropriate order granting the motion for summary judgment.

Entered: July 21, 2022.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

---

[1] Though Mendes' deposition mentions a fence, this fence did not enclose the Property.  (Mendes Dep. 118.)

[2] Wendling also asserts that he is entitled to qualified immunity on the Fourth Amendment claim.  When a federal right has not been violated, a defendant has no need of qualified immunity.  *Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007).  As such, the court finds it unnecessary to resolve Wendling's claim of qualified immunity.